**UNITED STATES of America, Plaintiff,**

v.

**ONE 1989 STRATFORD FAIRMONT 14′ × 70′ MOBILE HOME, LOCATED AT 290 SUSAN CIRCLE, PARK CITY, ILLINOIS, Defendant.**

**No. 91 C 1792.**

United States District Court, N.D. Illinois, E.D.

Feb. 11, 1992.

Ernest Ling, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Marc W. Martin, Genson, Steinback & Gillespie, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This proposed drug-related forfeiture of a mobile home poses, at least so far as reported cases are concerned, a question of first impression anywhere. Both the United States and claimant Mark Stover ("Stover")[1] have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56,[2] coupling their motions with the required statements under this District Court's General Rule ("GR") 12(m)[3] as well as supporting memoranda. Each party has responded to the other's submission, and the case is ripe for decision. For the reasons stated in this memorandum opinion and order, the United States' motion is granted, Stover's is denied, and the mobile home is ordered forfeited.

### Facts

On January 15, 1991 18–year–old Stover, then living in the mobile home at its permanent location at 290 Susan Circle, Park City, Illinois, was the target of a raid of his residence carried out by Lake County and other drug enforcement agents pursuant to

---

1. For some unexplainable reason Stover's lawyers refer to him throughout their submissions as "Stovar." But all of the documents that have been tendered to this Court (including (a) a lease bearing his signature as well as (b) the bill of sale covering the mobile home and designating him as grantee and (c) the transcript of his deposition listing his name) uniformly spell it "Stover." This opinion of course takes him at his word in that respect.

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross motions are involved, that principle thus demands a dual perspective—one that this Court has sometimes described as Janus-like—that sometimes causes the denial of both motions. But where as here there is no quarrel about any of the operative facts, that double-denial possibility vanishes.

3. Both litigants have mistakenly referred to GR 12(1) rather than 12(m), reflecting the prior designation of that provision within GR 12 (which was relettered some time ago as the result of amendments that did not change the content of the provisions relating to Rule 56 motions). Although neither party has responded to the other's GR 12(m) statement with the statement required under GR 12(n), that failure poses no problem here because (as reflected in n. 2 and in the text's factual discussion) their dispute is over the law and not the facts.

a validly-obtained search warrant. Two of Stover's friends were with him at the time. When the agents searched the mobile home, they found something over a half ounce of marijuana (16.19 grams) floating in a toilet, as well as a host of other items reflecting drug-related activity: four live growing green plants later identified (and testing positive) as cannabis or marijuana, several dried plants and plant parts later identified (and testing positive) in the same way, a notebook containing records of drug transactions, cannabis smoking paraphernalia, photographs of cannabis plants, cannabis publications, a portable weighing scale, empty plastic bags and a heat sealer used to seal plastic bags, and some .22 caliber ammunition.

Stover was arrested and was then made the subject of drug charges in the Circuit Court of Lake County. Those charges resulted in his March 4, 1991 plea of guilty to a felony crime of possession of between 10 and 30 grams of marijuana with intent to deliver.

So much then for the underlying predicate for the proposed forfeiture. To shift to the target of that forfeiture, Stover had purchased the mobile home some months before (in late July 1990) for $29,000 cash.[4] As is often the case with such residences, "mobile" is more of a euphemism than "home": Stover bought the two-bedroom two-bath residence in place (mounted on concrete blocks and with all utilities hooked up) on a lot in a "mobile home park"—it was one of a group of what Stover estimated during his deposition as 200 such homes in the same area.[5] Like the former owners who sold the mobile home to Stover, he leases the lot on which it is located. There are an associated wood deck and woodshed located in the lot close by the mobile home itself, and the mobile home is fully equipped with the full set of conventional home appliances, which are hooked up to the utilities provided to the lot and hence to the mobile home itself.

Still on the subject of "mobility" (or perhaps more accurately the lack of it), any removal of the mobile home would entail cutting the "tie-downs" (those are wires that anchor the four corners of the mobile home to its location atop the concrete blocks), oiling the axles so that they would be available for use in its transportation, jacking up the mobile home to put the wheels under it, attaching a front hitch and then hooking the mobile home to a truck of some kind to enable it to be pulled away.[6] During the period of more than a year that elapsed between Stover's acquisition of the mobile home and his October 11, 1991 deposition in this case, he knew of no one having moved into the mobile home park, and he had become familiar with the intricacies of removing and transporting such mobile homes by having observed the only owner whom he was aware of as having left the park in that period. If anyone were to move the mobile home, the process of transporting its oversize load on a highway (as the caption of this case indicates, the mobile home is about 14 feet wide and 70 feet long—nearly 1,000 square feet in size) would of course require not only a vehicle to accomplish the tow but a special permit for highway hauling.

### Forfeiture of the Mobile Home

Obviously uncertain whether to label the mobile home as animal, vegetable or mineral, the United States resorts to alternative pleading—thus essentially saying that the

---

4. This Court should hasten to add that there is nothing at all sinister in such a large cash transaction by teenager Stover. As a result of the structured settlement of a complex medical malpractice action that had been settled on his behalf by his parents, he received a substantial lump sum together with a contract for annuity payments of some $15,000 annually. One of the uses to which he put the lump sum payment was the purchase of the mobile home for himself, and he then moved out of the family household.

5. That estimate covered only the section of Farmington Estates (also known as Midway Mobile Home Park) in which Stover's mobile home is located—it is just one of four sections in that park.

6. In its present position at rest on the lot that it occupies, the mobile home is surrounded by trimmings that give it the appearance of permanence (concealing the axles and any other indications of potential mobility).

mobile home has to fit one of three subsections of the 21 U.S.C. § 881[7] forfeiture statute (though the United States may not know just which one): Section 881(a)(3), (4) or (7). Here are the relevant provisions:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.

(2) All raw materials, products, and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance in violation of this subchapter.

(3) All property which is used, or intended for use, as a container for property described in paragraph (1), (2), or (9).[8]

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1), (2), or (9) [with exceptions inapplicable to this case].

* * * * * *

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment [with an exception inapplicable to this case].

Stover's counsel responds to the government's multiple-choice assertion in that respect by figuratively checking the box labeled "None of the above." As he would have it, the mobile home is nonforfeitable because it does not come within any of the three paragraphs—instead it falls into the cracks between them.[9]

Thus this case occupies none of the battlegrounds that are familiar to all those who handle forfeiture litigation as a regular matter:[10] disputes over such matters as the shifting of burdens of proof (see, e.g., *United States v. Fleming*, 677 F.2d 602, 609–10 (7th Cir.1982), affirming and approving this Court's opinion at 521 F.Supp. 1253, 1255–57 (N.D.Ill.1981); *United States v. One 1985 BMW 318i*, 696 F.Supp. 336, 339 (N.D.Ill.1988)) or the claimed innocence of the owner of the property sought to be forfeited (see, e.g., *id.* at 344–46), or the sufficiency of the nexus between the property and any drug-related activity (see, e.g., *United States v. 30 Ironwood Court*, 776 F.Supp. 1242, 1244–45 (N.D.Ill.1991)), or the disproportionality of the property forfeited to the narcotics offense involved (see, e.g., *id.*), or even the very standing of the claimant to contest the forfeiture (see, e.g., *United States v. $501,958*, 633 F.Supp. 1300, 1300–02 (N.D.Ill.1986)). Instead Stover's lawyer has admitted that none of those potential outs is available to his client—the question is rather one of examining the three statutory rubrics to see whether the mobile home fits under any of them.

As indicated at the outset of this opinion, that presents one of the rare opportunities for a court to write on a totally clean slate.

---

**7.** Further citations to the Title 21 provisions will simply take the form "Section —".

**8.** [Footnote by this Court] Section 881(a)(9) is not relevant to the current controversy and will therefore not be reproduced here.

**9.** If the controlled substance involved here had been not marijuana but instead the especially potent and (unfortunately) increasingly popular form of cocaine, that reference to "cracks" could be viewed as a particularly bad pun. But if so, this Court would simply have joined the punsters' club that has been organized (wittingly or unwittingly) by defense counsel, whose responsive Mem. 1 disclaims any intention to "*rehash* our prior arguments...."

**10.** Because the listing that follows in the text is merely exemplary—illustrating the sorts of commonly-encountered forfeiture issues that are *not* implicated here—this Court has simply picked from a grab-bag of its own published opinions in the field for purposes of that illustration.

In its memoranda the United States cites only two cases (neither of which involves a holding on point),[11] while Stover's two memoranda are distinguished by their having cited no cases at all that bear on the issue presented for decision here. Hence this Court is compelled to venture onto the terra incognita of logic coupled with potentially treacherous analogies.[12]

■ As for Section 881(a)(3), it is really absurd to contend that the mobile home served as a "container" for the contraband controlled substance in any reasonable sense of the word. Unless "container" is to be read as anything ranging in size from a capsule to a castle—or perhaps anything in the world except property within the scope of the "open fields" doctrine—that alternative is patently absurd.

■ As for Section 881(a)(4), Stover surely has the better of the argument in rejecting any characterization of the mobile home as a "conveyance." It is true that the mobile home may be labeled as a "vehicle" in the sense that, for example, the Illinois Secretary of State issues a certificate of title for mobile homes, just as such certificates are issued for conventional automobiles and similar means of transportation. But it is clear from both the language and the structure of that paragraph that it is intended to connote a "conveyance" that is really mobile in everyday terms (as in the first case cited in n. 11), and not in the sense of the cumbersome

and rare movement that is possible though abnormal for a technically "mobile" home such as the one that has been acquired and maintained by Stover as a purely stationary residence.

■ That then relegates the United States to Section 881(a)(7), as to which the question becomes whether a mobile home may fairly be characterized as "real property"—including for that purpose "any appurtenances or improvements" to "any lot or tract of land." For that purpose it would seem logical that even though Section 881 in its various paragraphs does not necessarily occupy the entire universe (that is, the statute need not be seen as a totally seamless web), the very same consideration described in the preceding paragraph—one that takes the mobile home out of the "conveyance" category in terms of Section 881(a)(4)—also tends to be persuasive as to the inclusion of mobile homes in the broad definition of Section 881(a)(7).

It is to be sure entirely accurate that as between Stover and his landlord—the owner of the mobile home park—the mobile home is characterized under their Mobile Home Lot Lease as personal property (see e.g., paragraph 22 of that document). Were it otherwise, the nature of the mobile home's attachment to the freehold could well embroil Stover in the intricacies of landlord-tenant law relating to "fixtures" and like improvements, so that he could run the risk of losing the right of its removal as and when he might ultimately

---

**11.** *United States v. Steele,* 727 F.2d 580, 590 (6th Cir.1984) dealt in minor part with the seizure under authority of Section 881 of a motor home—but that was the quite different type of "home" (truly a "conveyance") that is frequently seen on the highway, being used by travelers as a combination vehicle and residence. Indeed it was being used for the actual *transportation* of drugs when it was seized. Obviously that case casts no light at all on the question confronting this Court. *United States v. A Single Story Double Wide Trailer,* 727 F.Supp. 149 (D.Del.1989) did involve the forfeiture of what appears to have been property comparable to the mobile home at issue here, but the focus of that opinion was on the ability of the trailer's owner to sustain an "innocent owner" defense. There was no analysis of or decision on the question that this Court must decide—instead the court there simply said, *id.* at 152 n. 3, en route to its

determination as to that "innocent owner" status (a defense available under both Section 881(a)(4)(C) and Section 881(a)(7)):

> The Court will assume that the double wide trailer in question is either a "conveyance" or real property within the meaning of these sections.

Clearly the owner there did not make the contention that Stover advances here.

**12.** From this point forward, then, neither the analysis nor the citation of authorities in this opinion owes anything to the litigants' counsel. Despite the enjoyment that this Court derives from conceptualizing and resolving legal problems, that is really a distressing state of affairs—at a minimum the lawyers for the parties ought to provide the bulk of the legal raw material from which a court may then fashion its solutions to questions of law.

decide to depart from the park—something that would clearly defeat the parties' understanding and expectations. From the landlord's point of view, characterizing the mobile home as part of the real estate vis-a-vis the tenant might create unknown potential liabilities to the tenant or to third parties—again something to be avoided. Hence both tenant and landlord have substantial motivations (though perhaps not of equal weight) for agreeing upon a "personal property" classification.

But that relationship between landlord and tenant, distributing their rights and duties as between themselves, does not necessarily control the rights and duties under the forfeiture provisions of the United States Code. No more so would it seem appropriate to view the forfeiture answer as necessarily controlled by a facet of Illinois property law that points in the 180° opposite direction: Illinois' real estate tax provisions, which expressly define "real property" as including not only the land itself but also "any vehicle or similar portable structure used or so constructed as to permit its being used as a dwelling place for one or more persons, if such structure is resting in whole on a permanent foundation" (Ill.Rev.Stat. ch. 120, ¶ 482(13)). To the identical effect, *Pappmeier v. Green Tree Acceptance, Inc.*, 193 Ill.App.3d 824, 140 Ill.Dec. 689, 550 N.E.2d 574 (3d Dist. 1990)—relying on that provision—has held that the nature of a mobile home as "real property" caused a real estate tax lien on that property to be superior to a finance company's recorded and perfected security interest in the mobile home.

Thus the resolution of competing interests in different contexts may call for different labels to be attached to the normally immobile and fixed-in-place "mobile" home. For the purpose now at issue, this Court finds the most persuasive analogy to be the treatment of mobile homes for Illinois homestead exemption purposes under the statute's pre–1982 version of that statute.[13] At that time the homestead exemption extended only to *real property* used as a personal residence, whether located on leased or owned land (see *Capitol Bank & Trust of Chicago v. Fascetta*, 771 F.2d 1077 (7th Cir.1985), which refused to hold that the homestead exemption under the pre–1982 version extended to the typical Illinois land trust—which is conceptually personal property—even though the underlying subject matter of every land trust is of course real estate). And on that score—the proper meaning of "real property" for homestead purposes—the discussion by Bankruptcy Judge Robert Ginsburg in *In re Hockinson*, 60 B.R. 250 (Bankr.N.D.Ill. 1986) is both enlightened and enlightening.

*Hockinson* involved a mobile home of the same type as that at issue in this case—as Judge Ginsburg said (*id.* at 253 n. 6), one that is "only mobile in the technical sense." There too a contractual document had characterized the mobile home as "personal property" and *not* as "real property"—in that case the "personal property" label was specified in the loan documents from the bank that had entered into a retail installment contract to provide the financing for the purchase of the mobile home. And here is what Judge Ginsburg said, *id.* at 252–53 & n. 6 (most citations omitted):

> Despite the contract language suggesting that the mobile home in question should be treated as personalty, this Court finds that the facts of this case demonstrate that it is in fact realty, and that the debtor in this case who is the head of household could have asserted a $10,000 exemption under the former exemption statute. The appropriate indicator of whether a "mobile home" remains personal property or has become "something more" than personal property is essentially whether the mobile home has become a fixture by virtue of its physical relationship to the land on which it is placed and the intention of the parties. Although no Illinois court has specifically adopted this test, at least one federal court in Illinois has applied a similar test.

13. On January 1, 1982 the statute, then Ill.Rev. Stat. ch. 52, ¶ 1 and now Ill.Rev.Stat. ch. 110, ¶ 12–901, was expressly amended to cover any personal property used as a homestead residence.

The court in *Matter of Matthews,* 43 B.R. 466 (D.Ct.N.D.Ill.1984) held that a debtor's mobile home was exempt under the former homestead exemption statute.[14] The *Matthews* court based its decision on the fact that the debtor intended to permanently affix the mobile home to realty because utilities had been connected to the home, and the debtor and his family resided in the home for 14 years. *Id.* at 467.

\*   \*   \*   \*   \*   \*

The Bank's reliance on the provision in the contract to the effect that the mobile home shall be deemed to be personalty rather than realty is misplaced. That provision is in reality a device designed to waive the debtors' homestead exemption rights in the mobile home under the prior law.[6] It is clear that the clause in question is invalid as a waiver of a real property homestead exemption under both Illinois law in existence at the time the agreement was signed and at the time the petition was filed.

---

[6] The same analysis applies to the provision in the contract prohibiting the debtors from affixing the mobile home to land. It is clear that these mobile homes are only mobile in the technical sense. Residents rarely tow these things behind their cars. Instead, as in this case, debtors commonly park the home in one spot for lengthy periods of time. In fact, the balance of that provision in the contract provides for special insurance requirements in the event the mobile home is to be moved, thus confirming that the Bank was aware of the realities of the situation. This clause and the clause calling the home personalty *supra* n. 4 are nothing more than attempts by the Bank to have the debtors waive homestead rights in their not-so-mobile home.

Except for the different end in view in *Hockinson* (construing the homestead notion of "real property," as against this Court's task of defining the forfeiture statute's use of the same concept), much of the quoted opinion might have been written for this case. It is true that there the period during which the mobile home had remained in place was some seven years, while here the corresponding total time

---

**14.** [Footnote by this Court] *Matthews* was an opinion by this Court's then colleague Hon.

frame is uncertain because the parties have offered no evidence as to how long the mobile home had remained on the same lot during its ownership by the people who sold to Stover. But the principle is identical: It is unrealistic to view the wholly non-peripatetic mobile home as something other than "real property" simply because the word "mobile" is tacked on before the word "home," just as it is unrealistic to label it as a "conveyance" because the word "mobile" is there. In real world terms, and hence for purposes of Section 881(a)(7), Stover's mobile home should be considered as "real property."

In summary, none of the other contexts in which "real property" has been defined presents a perfect analogy to the statute involved here. Something that may be "real property" for one purpose is not necessarily classified in that same manner for another. But any general notion that forfeiture statutes ought not to be read as painting with an extraordinarily broad brush should not be permitted to overcome common sense in the reading of such statutes. And this Court concludes that the typically immobile mobile home, when used in the stationary manner that Stover's predecessor owner and Stover have used it, comes within the Section 881(a)(7) definition of "real property" with its inclusion of "appurtenances or improvements."

### Conclusion

One thing is clearly not in dispute here: There is no genuine issue of material fact. And this Court has resolved the legal dispute between the parties, based on the undisputed facts, by determining that the United States is entitled to a judgment as a matter of law. Accordingly Stover's mobile home is ordered forfeited to the United States under 21 U.S.C. § 881(a)(7).